UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


ROY GLENN MESSER,

      Plaintiff,

v.                                     Civil Action No. 2:08-0880

LONNIE HANNAH, in his capacity as
SHERIFF OF MINGO COUNTY,

      Defendant.


MEMORANDUM OPINION AND ORDER


      Pending is the defendant's motion for summary judgment, filed July 1, 2009.


I.


      The Mingo County Sheriff's Department hired Roy Glenn Messer as a deputy sheriff in April 1996. (Compl. ¶ 5). Beginning in February of 2006, Messer filed a series of grievances with the Mingo County Civil Service Commission ("Commission") based on actions taken by Sheriff Lonnie Hannah, his superior officer. Messer asserts in this action "violations of the provisions of the Constitutions of the United States, and of the State of West Virginia, 42 U.S.C. § 1983, under the WV Code including but not limited to Section 61-5-26(f), under the

common law of the State of West Virginia, and under the case law of the Courts of the United States of America and the State of West Virginia."[1]  (Compl. ¶ 4).

The following grievances and actions taken by Sheriff Hannah are the foundation of Messer's § 1983 claim for retaliation and discrimination under the Fifth and Fourteenth Amendments of the United States Constitution.

A. Grievance Regarding Lieutenant McCloud's Promotion

On February 8, 2006, Sheriff Hannah promoted Deputy Moss McCloud to the rank of lieutenant.  (Compl. ¶ 6A).  Messer

---

[1] Messer's state claims are less than clear.  The sole West Virginia statutory citation provided does not appear to exist. Based on the nature of the claims alleged by Messer, it may be that the intended citation was to section 61-5-27(f), which provides a civil cause of action against any person who violates section 61-5-27.  This section makes it unlawful to intimidate, harass, or retaliate against public officers, officials, and employees during performance of official duties.  W. Va. Code § 61-5-27 et al.

Messer does not elaborate on the nature of his claims under the West Virginia Constitution or common law.  It is possible that he is asserting violations of Article III, sections 1 and 10 of the West Virginia Constitution.  Alleged violations of these provisions roughly correlate with violations alleged by him under the Fifth and Fourteenth Amendments of the United States Constitution.  However, the court is reluctant to define the extent of Messer's state claims based on its own speculation.

and Randy Hatfield, a fellow deputy, filed grievances on February 17, 2006, with the Commission challenging whether Sheriff Hannah followed the proper procedures for McCloud's promotion.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 2).  Messer and Hatfield specifically protested Sheriff Hannah's failure to have McCloud medically examined for fitness of duty as required by W. Va. Code § 7-14-9 and his failure to prepare the requisite evaluations of all the deputies within his department.  (Id.)  On March 6, 2006, the Commission held a hearing regarding the grievances filed by Messer and Hatfield.  (Compl. ¶ 6D).

During the grievance hearing, Sheriff Hannah initially denied having promoted McCloud.  (Pl.'s Resp. 1).  To contradict his testimony, Messer's attorney confronted Sheriff Hannah with a payroll slip sent by the Sheriff to the payroll clerk increasing McCloud's pay based on his promotion.  (Messer Aff. Ex. 2 at 1).  It was only upon presentation of the payroll slip during the hearing that Sheriff Hannah acknowledged that he had prepared the slip and withdrew the promotion only after grievances were filed by Messer and Hatfield.  (Pl.'s Resp. 7).  Following the hearing, on March 20, 2006, Sheriff Hannah suspended both Messer and Hatfield for thirty days for allegedly removing documents relating to another employee from the office.  (Compl. ¶ 6F;

3

Pl.'s Resp. 1).  On March 22, 2006, Chief Field Deputy Bruce Stroud rescinded the suspensions after a conversation with Messer's attorney.  (Compl. ¶ 6F; Pl.'s Resp. 1).  Following the grievance process, the Sheriff again promoted McCloud to the rank of lieutenant.[2]  (Pl.'s Resp. 1).

Thereafter, Sheriff Hannah failed to follow the statutorily required process for promotion in other instances. On May 18, 2009, the Commission set aside then-recent promotions of two deputies because Sheriff Hannah had not completed the required medical examination and certification of the doctors prior to promotion.  (Pl.'s Resp. at 6; Ex. 15).  Messer believes that the numerous retaliatory and discriminatory acts taken against him by Sheriff Hannah stem from his filing a grievance regarding McCloud's promotion.  (Pl.'s Resp. at 1).

B. Grievance Regarding Messer's Assignment to Bailiff Duty

During the time between the filing of the grievance related to McCloud's promotion on February 17, 2006, and mid-

_____

[2] It is unclear from the plaintiff's complaint and response to the defendant's motion for summary judgment whether the second promotion of Deputy McCloud followed the statutorily required procedure.

April 2006, Sheriff Hannah changed Messer's work schedule on three different occasions.[3]   (Compl. ¶ 6C, E, I).   Messer's schedule changed in February, March, and April 2006.   (Id.)   In April 2006, Messer learned that Sheriff Hannah had given a deputy junior to Messer in seniority a shift working Monday through Friday with weekends off.   (Pl.'s Resp. 3).   It had been the practice of the Sheriff's Department to provide preferential shifts, when they became available, to deputies on the basis of seniority.   (Id. at 8).   As such, Messer requested that his schedule also be changed to a Monday through Friday shift.   (Id.)

When the Sheriff made the change to Messer's schedule, Messer received a Monday through Friday schedule with weekends off as requested, but was assigned to the Mingo County Magistrate Court as a bailiff.   (Id.)   On April 19, 2006, Messer's attorney requested an explanation for the latest change in Messer's assignment, but received no response.   (Id. at ¶ 6K).   In early May, Sheriff Hannah took away Messer's deputy cruiser.[4]   (Id. at

---

[3] Additionally, Sheriff Hannah changed Messer's schedule on February 20, 2007. (Compl. ¶ 6KK).

[4] With regard to Messer's deputy cruiser, there is an inconsistency in Messer's complaint.   Messer states that Sheriff Hannah took away his cruiser following his assignment to bailiff in May 2006. (Compl. ¶ 6M).   However, Messer's complaint lists several occurrences following the May 2006 removal relating to his continued use and possession of a deputy cruiser.   (Compl. ¶¶ 6AA,
(continued...)

¶ 6M).  On January 5, 2007, Messer was instructed to turn in any equipment or items associated with the Special Response Team because Messer had vacated his position on the team as a result of his assignment to bailiff.  (Compl. ¶ 6Y).  In Messer's opinion, the bailiff assignment was effectively a demotion and a waste of his valuable skills and experience as a deputy.  (Pl.'s Resp. 8).  Messer asserts that Sheriff Hannah assigned him to the bailiff position as a form of retaliation and punishment. (Id.)

## C. Grievance Regarding the Alleged Falsified Overtime Request

Prior to being placed on bailiff duty, Messer attended a special police training session at the State Police Academy in South Charleston from April 10 through April 13, 2006.  (Pl.'s Dep. 53).  Sheriff Hannah authorized the attending deputies to bill two hours of travel overtime to and from the academy each day.  (Pl.'s Resp. 1).  Accordingly, Messer billed two hours of travel each way for four days for a total of sixteen hours. (Id.)  In contrast, Deputy Charlie Justice, who also attended the

---

(...continued)
BB, CC, GG, HH).  For example, Messer states that the incident of his alleged insubordination began when Chief Deputy Stroud demanded that Messer turn over his cruiser keys on March 23, 2007.  (Pl.'s Resp. 10).  It is unclear when the cruiser was returned to Messer, but Messer's statement of facts plainly indicates that it must have been returned at some point.

entire four day session, only billed two hours of travel each way
for three days for a total of twelve hours.  (Id.)  When Sheriff
Hannah discovered the discrepancy on May 11, 2006, he asked the
West Virginia State Police to begin an investigation against
Messer for billing overtime that he had not actually accrued.
(Compl. ¶ 6N).  On May 12, 2006, Sheriff Hannah suspended Messer
indefinitely without pay because of the ongoing investigation.
(Id. at ¶ 6O).

        Trooper Mike LaFauci led the investigation into
Messer's overtime claims.  (Pl.'s Resp. 8; Ex. 13).  On May 12,
2006, Trooper LaFauci met with Sheriff Hannah and Mingo County
Prosecuting Attorney Michael Sparks to discuss the investigation
and the possibility of pursuing criminal charges.  (Pl.'s Ex. 13
at 4).  Sparks stated that he would prefer to handle the matter
administratively before pursuing criminal charges, but felt that
there was enough evidence to charge Messer with obtaining money
under false pretenses.  (Id.)  Trooper LaFauci's investigation
revealed that Messer had rented a hotel room close to the academy
for the duration of the training session, but Messer informed him
that he had also driven home several times.  (Pl.'s Resp. 1;
Pl.'s Ex. 13 at 5).

                        7

On May 22, 2006, Messer filed a grievance with the Commission regarding his suspension for the alleged fraudulent overtime travel billing while Trooper LaFauci's investigation was still ongoing.  (Compl. ¶ 6P).  Sheriff Hannah contacted Trooper LaFauci on May 30, 2006, to inform him that Messer had filed a grievance.  (Pl.'s Ex. 13 at 5).  Sheriff Hannah told Trooper LaFauci that he felt that criminal charges needed to be filed to justify Messer's suspension during the grievance hearing before the Commission.  (Id.)  Sheriff Hannah stated that he would have Sparks contact Trooper LaFauci about proceeding with prosecution.  (Id.)  Later that day, Sparks instructed Trooper LaFauci to complete his investigation and obtain a criminal complaint against Messer for obtaining money under false pretenses.  (Id.)  During the investigation, Sparks wrote a letter to Sheriff Hannah stating that Messer's "integrity and credibility as a law enforcement officer has been irreparably compromised" and refused to prosecute any cases in which Messer was the primary investigating officer.  (Pl.'s Resp. 2).

Upon completing the investigation, Trooper LaFauci did not believe that there was legally sufficient evidence to bring a criminal charge regarding the twenty hours of overtime considering that the only amount in question would have been four

8

hours.[5]  (Pl.'s Resp. 2).  Trooper LaFauci never made a finding

of whether Messer made false claims for overtime, only that he

had in fact rented a hotel room in South Charleston during the

training period.  (Id. at 1-2).

The Commission held a hearing regarding Messer's

grievance and suspension for the alleged falsified overtime

requests on July 18, 2006.  (Id. at ¶ 6S).  The Commission issued

a final order in favor of Messer on September 18, 2006, and held

that Sheriff Hannah did not have just cause for the indefinite

suspension without pay.  (Id. at ¶ 6T).  The Commission ruled

that Messer should be reinstated to his former rank and position

with full pay and no charges recorded on his record. (Id. at ¶

6U).  Furthermore, the Commission noted that the alleged

overcharge of travel time was trivial in nature and that the

issue should have been handled administratively rather than

through criminal investigation.  (Id. at ¶ 6V).

Sheriff Hannah appealed the Commission's order to the

Circuit Court of Mingo County on November 2, 2006.  (Id. at ¶

_____

[5] Trooper LaFauci's stated that there were twenty hours of
overtime with only four hours in question during his testimony
before the Commission.  It is unclear as to how Trooper LaFauci
arrived at a total of twenty hours when Messer appears to have
only claimed a total of sixteen hours for the trip.  However, the
difference is immaterial to the court's decision.

6X).   During his appeal, Sheriff Hannah continued in his attempt
to criminally prosecute Messer.  (Compl. ¶ 6EE).   The Mingo
County Grand Jury issued a finding of no true bill and there were
no criminal charges brought against Messer.  (Id.)  On January
30, 2007, the circuit court affirmed the decision of the
Commission to reinstate Messer.  (Pl.'s Resp. 2).   Sheriff Hannah
then appealed the circuit court's decision to the Supreme Court
of Appeals of West Virginia.  (Id.)  Meanwhile, Sheriff Hannah
placed Messer back on road patrol in December 2007 while his
appeal to the supreme court was pending.  (Pl.'s Resp. Ex. 10 at
3-4).  Additionally, the Mingo County Prosecuting Attorney's
office began prosecuting cases pursuant to arrests made by Messer
in January 2008.  (Id.)

     On June 26, 2008, the supreme court reversed the circuit
court's decision and reinstated Messer's indefinite suspension.
Messer v. Hannah, 668 S.E.2d 182, 188 (W. Va. 2008).  The supreme
court did so because the Commission and the circuit court
"'failed to consider an important aspect of the problem,'"
specifically the importance of Prosecutor Sparks' letter refusing
to prosecute cases investigated by Messer.  Messer, 668 S.E.2d at
188 (quoting In re Queen, 473 S.E.2d 483, 487 (W.Va. 1996)).  In
so holding, the supreme court noted that the indefinite

suspension of Messer may constitute a <u>de facto</u> termination of his employment.  <u>Id.</u> at 188 n. 1.


D. Grievance Regarding Messer's Ten Day Suspension and Subsequent Termination for Insubordination


          Until December 2007, Messer continued to work as bailiff in the Mingo County Magistrate Court.  (Pl.'s Resp. 3). By letter dated March 19, 2007, Sheriff Hannah limited Messer to performing bailiff duties only and prohibiting his participation "in any investigating matters unless specifically directed to do so" by Sheriff Hannah.  (<u>Id.</u> at 10; Ex. 16).  Sheriff Hannah attached to the letter an order entered by Mingo Circuit Judge Michael Thornsbury on February 5, 2007.  (<u>Id.</u>; Ex. 11 at 3). Judge Thornsbury's order requires the Sheriff of Mingo County to provide a certified officer to act as a permanent bailiff for both the magistrate and circuit courts of Mingo county, and orders that bailiffs of the court "be prevented from participating in any investigations or matters while they are designated as court bailiffs, to the extent that said matters might necessitate the bailiff being called as a witness before the jury they are attending."  (Ex. 11 at 3).


11

After Sheriff Hannah limited Messer's activities exclusively to those of a court bailiff, Chief Field Deputy Stroud approached Messer at the Mingo County Magistrate Court and requested that Messer turn over his cruiser keys.  (Pl.'s Resp. 3).  Mingo County deputies are typically allowed to take their cruisers home with them, providing them a means to and from their homes at Mingo County's expense.  (Id. at 10).  Messer asked for an explanation and Stroud instructed Messer to accompany him to the Sheriff's office.  (Id. at 3).  During the meeting, Messer recorded the conversation on his personal recording device. (Id.)  The meeting ended without any action taken after Messer refused to turn over his personal recording device and Sheriff Hannah characterized his refusal as insubordination.  (Id.)

On March 19, 2007, Messer received a ten day suspension for insubordination and refusal to obey orders.[6]  (Compl. ¶ 6LL). Messer filed a grievance regarding his suspension with the Commission on April 2, 2007.  (Id. at ¶ 6MM).  On April 5, 2007, Sheriff Hannah sent Messer a letter terminating his employment based on the insubordination referenced in the March 19, 2007,

---

[6] Plaintiff's response to defendant's motion for summary judgment states that Sheriff Hannah's letter limiting Messer to bailiff duties exclusively was dated March 23, 2007; however, the letter attached to plaintiff's response as Exhibit 16 is marked March 19, 2007.

letter. (Id. at ¶ 6NN; Pl.'s Resp. 3). Messer filed a grievance regarding his termination with the Commission on April 9, 2007. (Id. at ¶ 6OO).

On April 20, 2007, the Commission reinstated Messer pending a full hearing concerning his grievances filed on April 2 and April 9, 2007. (Id. at ¶ 6PP). During the hearing, Sheriff Hannah took issue with Messer continuing to serve emergency protective orders after receiving Judge Thornsbury's order. (Pl.'s Resp. at 10). Messer was aware of the order, but was never specifically instructed by Sheriff Hannah to stop serving Emergency Protective Orders, the service of which was available as an opportunity for overtime to all Mingo County deputies. (Id.) Sheriff Hannah suggested during the grievance hearing that this was another example of Messer disobeying orders. (Id.) Following the hearing, the Commission entered an order on June 12, 2007, upholding the initial ten day suspension of Messer for insubordination, but reversing his termination. (Id. at ¶ 6MM; Pl.'s Resp. 3). Neither party appealed this decision. (Pl.'s Resp. at 11).

**E. Messer's Application to the West Virginia State Police
Department**

In May 2006, Messer participated in the testing process to
become a member of the West Virginia State Police 57th Cadet
Class.  (Compl. ¶ 6L).  Later that month, Messer received notice
of his suspension regarding the alleged falsified overtime
charges discussed above.  (Id. at ¶ 6O).  On June 8, 2006, Messer
received a letter informing him that his application to the West
Virginia State Police would receive no further consideration.
(Id. at ¶ 6Q).  Messer called Human Resources at the West
Virginia State Police Headquarters to inquire as to the reason
for the rejection of his application.  (Pl.'s Resp. at 9).
Marsha Beasley informed him that his application had been
rejected based on the suspension regarding the alleged falsified
overtime.  (Id.)

Messer applied to the West Virginia State Police again
in 2007.  (Id. at 4).  On June 18, 2007, just six days after the
Commission upheld his ten day suspension for insubordination,
Messer received a letter informing him that his second
application to the West Virginia State Police would receive no
further consideration.  (Compl. ¶ 6SS).  In March 2009, Messer
began the application process yet again.  (Pl.'s Resp. Ex. 17

14

at 1). Upon completing the Personal History Questionnaire, Messer received written notice on March 25, 2009, of his removal from the candidates for the 60th Cadet Class. (Id.)

On March 30, 2009, Messer wrote Lt. Colonel B. A. Sloan to request reconsideration of his application and to explain the history of his employment in the Mingo County Sheriff's Department. (Id.) Messer explained his belief that the suspensions in his past were the result of retaliatory acts by Sheriff Hannah and that the retaliatory suspensions had kept him out of the West Virginia State Police during the past three testing cycles. (Id.) By letter dated April 3, 2009, Lt. Colonel Sloan notified Messer that he would be unable to reconsider his application as it related to the 60th Cadet Class testing cycle. (Pl.'s Resp. Ex. 18 at 1). He conveyed to Messer that a ruling in his favor regarding the insubordination suspension would reflect positively for him in any future application, stating that "[a] stable, positive employment history is typically beneficial with prospective employers." (Id.)

**F. Denial of Messer's Request for Holiday Pay for Labor Day 2007**

While working as bailiff, the Mingo County Magistrate Court advised Messer to work according to the court's schedule on Labor Day 2007.  (Pl.'s Resp. 4).  The court assigned a magistrate judge to be on call for the day and Messer was instructed to remain available to the judge all day.  (<u>Id.</u> at 11).  This involved making frequent calls to the judge to ascertain whether he was needed for the entire day.  (<u>Id.</u>)  In order to be available for the magistrate judge if he was needed, Messer stayed home for the day.  (<u>Id.</u>)

On September 30, 2007, Messer requested holiday pay for being on call Labor Day.  (Compl. ¶ 6ZZ).  Sheriff Hannah rejected Messer's request on October 3, 2007.  (<u>Id.</u> at ¶ 6AAA).  Sheriff Hannah stated in his affidavit that Messer was expected to work in the Sheriff's Office when his duties as bailiff were not needed and that this arrangement was understood by Messer.  (Pl.'s Resp. at 11).  However, Messer believed that there were no other duties Messer could have performed in the Sheriff's Office without violating the Circuit's Order limiting his activities to those of a bailiff.  (<u>Id.</u>)

16

G. Additional Support Offered by Messer as Evidence of Sheriff Hannah's Pattern of Retaliation

In addition to the grievances and suspensions detailed above, Messer lists several additional incidents as evidence of Sheriff Hannah's pattern of retaliatory conduct. [7]

Following Messer's reinstatement by the Commission from the suspension related to the overtime charges, Messer received a letter on October 6, 2006, from the Mingo County Sheriff's Office, concerning his work area and his responsibility to "pass through" specific areas during his work hours.  (Compl. ¶ 6W).  Messer received another letter on January 23, 2007, accusing him of using a county vehicle while working his second job as security for the local community college.  (Compl. ¶ 6AA).  This letter required Messer to submit a letter explaining why he was using a county cruiser for private work without permission.  (Id.)  On April 25, 2007, the Mingo County's Sheriff's Office sent a letter to the community college requesting information

---

[7] Defendant's Motion for Summary Judgment notes an incident of retaliation cited by Messer in his deposition involving the questioning of his friend Deputy Miller.  As this incident is not mentioned by Messer in either his complaint or his response to defendant's motion for summary judgment, the court will not address the issue.

about the plaintiff's work there from March 1 through April 5, 2007.  (Compl. ¶ 6QQ).

Within three days of being accused of driving a deputy vehicle for private work, Messer filed a request for the use of a Durango.  (Id. at ¶ 6BB).  Lieutenant Moss McCloud was resigning and his county Durango would become available afterwards.  (Id.) At the time, Messer was driving a cruiser which was unfit for service and had excessive mileage.  (Id. at ¶ 6CC).  Messer's request, dated January 26, 2007, was denied.  (Id.)  Afterwards, Messer's cruiser experienced mechanical problems requiring him to use his personal vehicle for a period of time.[8]  On February 19, 2007, Messer requested reimbursement for the mileage he put on his personal vehicle for county purposes.  (Id. at ¶ 6GG).  The next day, Messer's request was denied. (Id. at ¶ 6HH).

On February 7, 2007, Messer requested an overtime shift inasmuch as other deputies routinely worked overtime shifts in the department.  (Id. at ¶ 6FF).  Messer's request was denied. (Id.)  On February 20, 2007, Messer turned in overtime hours earned while working as bailiff from February 12 through February

---

[8] The duration of time in which Messer's cruiser was out of commission requiring Messer to use his personal vehicle is not included in the complaint or response to defendant's motion for summary judgment.

20, 2007.  (Id. at ¶ 6II)  Messer did not receive payment for the overtime hours. (Id.)  On February 21, 2007, the Mingo County Sheriff's Office sent Messer a letter requiring him to explain his request for overtime.  (Id. at ¶ 6JJ).  It is unclear from the complaint whether Messer returned an explanation of the overtime claimed and whether he eventually received payment for those hours.

## II.

Messer instituted this action pursuant to 42 U.S.C. § 1983 on May 12, 2008, in the Circuit Court of Mingo County. Messer brings this suit against Sheriff Hannah in his official capacity.  Messer's complaint alleges discrimination, retaliation, harassment and intimidation by Sheriff Hannah in violation of the United States Constitution, the West Virginia Constitution, and West Virginia law.  The defendants removed on June 30, 2008.[9]

Sheriff Hannah seeks judgment as a matter of law based on the following arguments: 1) Messer fails to establish an

---

[9] Three Commissioners, who were originally named defendants in this matter, removed the case with Sheriff Hannah's consent.  The defendants other than Sheriff Hannah were subsequently dismissed with prejudice on August 7, 2008.

unconstitutional custom or policy promoted by Sheriff Hannah or the Mingo County Sheriff's office, 2) Messer fails to establish that Sheriff Hannah possesses final policymaking authority, 3) Messer fails to identify specific constitutional rights violated as a result of Sheriff Hannah's alleged conduct, and 4) Messer is barred from relitigating his claims by res judicata.

Messer responds that Sheriff Hannah engaged in numerous retaliatory acts against him stemming from his filing of a grievance over the improper promotion of Deputy McCloud. Messer claims that in doing so Sheriff Hannah violated his constitutional rights of due process and equal protection under the Fifth and Fourteenth Amendments. Messer notes specifically an infringement of his property interest in continued public employment, damage and injury to his reputation, and the adverse impact of Sheriff Hannah's actions on his ability to gain employment. Messer contends that Sheriff Hannah has the final authority to establish official employment policy for the Mingo County Sheriff's office. Messer claims that any control the Mingo County Commission might have over the Sheriff's decisions was relinquished as evidenced by the County Commissioners' continuing policy of approving the attorney fees of the Sheriff in matters based on his retaliatory actions against Messer and

other deputies.  Messer also asserts that the prior administrative and judicial decisions cited by Sheriff Hannah do not satisfy the factors required to find a case barred by <u>res judicata</u>.

III.

**A. The Governing Standard**

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support

21

the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal

conflicts resolved in his or her favor.  <u>Charbonnages de France</u>
<u>v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are
"drawn from the underlying facts . . . must be viewed in the
light most favorable to the party opposing the motion."  <u>United</u>
<u>States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).


B. Governing Law and Analysis


Section 1983 provides a statutory remedy for the
deprivation of constitutional rights by any person acting under
color of state law.  <u>Collins v. City of Harker Heights, TX</u>, 112
U.S. 115, 120 (1992).  There is a crucial distinction when, as
here, the government official defendant is named in his official
capacity rather than in his personal capacity.  <u>Kentucky v.</u>
<u>Graham</u>, 473 U.S. 159, 165.  Whereas personal-capacity "suits seek
to impose personal liability upon a government official for
actions he takes under color of state law," an official-capacity
suit is in essence a suit against the governmental entity.  <u>Id.</u>
at 165-66.  Accordingly, "an official-capacity suit is, in all
respects other than name, to be treated as a suit against the
entity."  <u>Id.</u> at 166.  Because Messer named Sheriff Hannah in his
official capacity, Messer's § 1983 claim will be analyzed as if
brought against Mingo County.

23

Whether a county official is a policymaking official is a question of state law. <u>Dotson v. Chester</u>, 937 F.2d 920, 924 (4th Cir. 1991); <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 124 (1988) (plurality). Policymaking authority may be bestowed on the official by state statute or by delegation from an official with final decisionmaking authority. <u>Id.</u> In evaluating whether an official possesses final authority over the policy of a municipality, the court should consider state and local law as well as any customs or usages having the force of law. <u>Riddick v. School Bd. of City of Portsmouth</u>, 238 F.3d 518, 524 (4th Cir. 2000) (citing <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989)).

In order to establish municipal liability under § 1983, the plaintiff must "'adequately plead and prove the existence of an official policy or custom fairly attributable to the municipality and that proximately caused the deprivation of their rights.'"[10] <u>Semple v. City of Moundsville</u>, 195 F.3d 708, 712

---

[10] A plaintiff may also establish municipal liability through "'persistent and widespread discriminatory practices of [county] officials'" that are "'so permanent and well settled as to constitute' a custom having the force of law." <u>Monell</u>, 436 U.S. at 690-91 (quoting <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 167-68)). Messer has not alleged sufficient evidence of the existence of a Mingo County custom of discrimination or retaliation. He asserts in passing that Sheriff Hannah routinely
(continued...)

(4th Cir. 1999) (quoting <u>Jordan by Jordan v. Jackson</u>, 15 F.3d 333, 338 (4th Cir. 1994)).  Municipal liability must rest on some action pursuant to an official municipal policy and not merely on <u>respondeat superior</u>.  <u>Collins</u>, 112 U.S. at 121.  While "official policy" clearly encompasses written rules or decisions promulgated by a municipality, it may also include official policies created when municipal officials make "a single decision regarding a course of action in response to particular circumstances."  <u>Semple</u>, 195 F.3d at 712 (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986) (plurality)).

While possible, it is not always the case that a single decision made by a city official will justify a finding of municipal liability.  "'Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" <u>Riddick</u>, 238 F.3d at 523 (quoting <u>Pembaur</u>, 475 U.S. at 481)).  Final policymaking officials are limited to those officials with the responsibility and authority to create official policy related to

---

[10](...continued)
used bailiff positions as a form of punishment and retaliation against his deputies.  While it may be the custom of Sheriff Hannah to do so, this does not appear to be so "widespread" or "permanent" as to constitute a custom of Mingo County.

that particular matter.  Id.  See Praprotnik, 485 U.S. at 124;
Pembaur, 475 U.S. at 482-83.

        The Fourth Circuit's interpretation of the principles
outlined in Pembaur and Praprotnik reveals that it is possible
for a given official to be simultaneously the final policymaking
authority in some instances and not in others.  Compare Crowley
v. Prince George's County, 890 F.2d 683, 685-87 (4th Cir. 1989)
(police chief is not the final policymaker with respect to
employment decisions); Greensboro Prof'l Fire Fighters Ass'n,
Local 3157 v. City of Greensboro, 64 F.3d 962, 966 (4th Cir.
1995) (fire chief is not the final policymaker with respect to
employment decisions) with Dotson v. Chester, 937 F.2d 920 (4th
Cir. 1991) (county sheriff is the final policymaker with respect
to operation of the county jail); Revene v. Charles County
Comm'rs, 882 F.2d 870, 874 (4th Cir. 1989) (county sheriff is the
final policymaker with respect to county law enforcement
training); Spell v. McDaniel, 824 F.2d 1380, 1387-88 (4th Cir.
1987) (police chief is the final policymaker with respect to
police training).  These cases reflect the dichotomy between
employment decisions subject to a higher policymaking authority
and operational decisions expressly vested in the official's
authority.  Yet, the result depends primarily on an analysis of

state and municipal law to determine where the final policymaking

authority resides.[11]

    In both instances, <u>Crowley</u> and <u>Greensboro</u>, in which the

Fourth Circuit found the municipal official lacked final

policymaking authority with regard to employment decisions, state

or municipal law vested that authority in a different municipal

_____

[11]    This view finds support in decisions from other
circuits.  <u>See</u> <u>Jeffes v. Barnes</u>, 208 F.3d 49, 60-61 (2d Cir.
2000) ("State law places the sheriff in charge of the Jail. . . .
We could agree with the view that the sheriff is not the final
policymaker for purposes of § 1983 analysis if the complaint were
simply that plaintiffs had been subjected to unwarranted formal
discipline or changes in job assignments."); <u>Brady v. Fort Bend</u>
<u>County</u>, 145 F.3d 691, 701 (5th Cir. 1998) (sheriff is final
policymaking authority with regard to filling employment
positions because "Texas law unequivocally vests the sheriff with
final policymaking authority"); <u>Bechtel v. City of Belton, MO</u>,
250 F.3d 1157, 1158, 1161 (8th Cir. 2001) (holding no municipal
liability in light of City Administrator's "ultimate authority to
approve or rescind departmental personnel decisions" despite
evidence that the "Fire Chief was in charge of establishing,
rules, regulations, policies and procedures for the operation of
the fire department"); <u>Davis v. Mason County</u>, 927 F.2d 1473,
1480-81 (9th Cir. 1991), <u>superseded by statute on other grounds</u>
(holding that sheriffs in Washington are policymakers for peace
officer training, but not for hiring practices); <u>David v. City</u>
<u>and County of Denver</u>, 101 F.3d 1344, 1358 (10th Cir. 1996)
("Applicable provisions of the Denver Municipal Code do provide
support for the City's contention that it is the Denver Civil
Commission rather than Chief [of Police] Zavaras or Manager of
Safety Martinez that was the final policymaker with regard to the
challenged disciplinary actions"); <u>Maschmeier v. Scott</u>, 508
F.Supp.2d 1180, 1183-83 (M.D. Fla. 2007), <u>aff'd</u> 269 Fed. Appx.
941 (11th Cir. 2008) (holding that sheriff was not the final
policymaker for decision to terminate deputy because the civil
service board had legal authority to review and reverse his
decision).

body.  In <u>Crowley v. Prince George's County</u>, a former employee of the Prince George County police department sued Prince George County under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, alleging a pattern of harassment and discrimination against him by the police chief.[12]  890 F.2d 683, 684 (4th Cir. 1989).  The police chief in <u>Crowley</u> downgraded the payscale for Crowley's position in alleged retaliation for Crowley's drawing attention to racial harassment when performing his job of investigating police brutality.  <u>Id.</u>  The Fourth Circuit held that the Prince George's County police chief was responsible for personnel decisions within the police department, but did not possess the final policymaking authority necessary for imposition of municipal liability.  <u>Id.</u> at 686.  The Prince George County Charter vested "the authority to establish and administer a personnel system in the County Council and the County Executive." <u>Id.</u>  Further, the charter mandated that all personnel decisions be based on merit and fitness.  Relying considerably on the Supreme Court's plurality decision in <u>Praprotnik</u>, the Fourth Circuit concluded that "[i]t is the municipality's policies, not 'the subordinate's departure[s] from them,' that must underlie

---

[12] The same principles of municipal liability apply to § 1981 and § 1983 actions.  <u>Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962, 966 (4th Cir. 1995); <u>see</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 735-36 (1989).

liability in such instances." <u>Crowley</u>, 890 F.2d at 687 (quoting <u>Praprotnik</u>, 485 U.S. at 127).

Similarly, in <u>Greensboro Prof'l Fire Fighters Ass'n,</u> <u>Local 3157 v. City of Greensboro</u>, a Greensboro fireman sued the City of Greensboro under 42 U.S.C. § 1983, alleging retaliation by the fire chief because of the fireman's active participation in the union. 64 F.3d 962, 963-64 (4th Cir. 1995). The fire chief had failed to promote him despite the fact that he had the highest score on the promotions list. <u>Id.</u> at 963-64. Based on relevant state and city laws, the Fourth Circuit held that the fire chief's "power to appoint and to establish procedures for making appointments was always subject to the parameters established by the City." <u>Id.</u> at 965-66. Accordingly, the court found that the fire chief's "discretion to hire and fire did not necessarily include responsibility for establishing related policy." <u>Id.</u> at 966.

In both <u>Crowley</u> and <u>Greensboro Prof'l Fire Fighters</u> <u>Ass'n</u>, the Fourth Circuit referenced a pertinent hypothetical discussed by the plurality in <u>Pembaur</u>:

> Thus, for example, the County Sheriff may have
> discretion to hire and fire employees without also
> being the county official responsible for establishing
> county employment policy.  If this were the case, the

> Sheriff's decisions respecting employment would not
> give rise to municipal liability, although similar
> decisions with respect to law enforcement practices,
> over which the Sheriff is the official policymaker,
> would give rise to municipal liability.  Instead, if
> county employment policy was set by the Board of County
> Commissioners, only that body's decisions would provide
> a basis for county liability.  This would be true even
> if the Board left the Sheriff discretion to hire and
> fire employees and the Sheriff exercised that
> discretion in an unconstitutional manner; the decision
> to act unlawfully would not be a decision of the Board.
> However, if the Board delegated its power to establish
> final employment policy to the Sheriff, the Sheriff's
> decisions would represent county policy and could give
> rise to municipal liability.

Pembaur, 475 U.S. at 484, n.12 (emphasis in original).  The

hypothetical highlights the importance of the distinction between

the authority to make final policy and the authority to make

final implementing decisions.  Greensboro Prof'l Fire Fighters

Ass'n, 64 F.3d at 966.

        In this instance, Messer claims Sheriff Hannah is the

final policymaking authority with regard to Messer's employment

claims based on his assertion that "Sheriff Hannah has the

authority to hire and fire his employees and to assign said

individuals to such duties as he chooses."  (Pl.'s Resp. 6).

However, Messer's conclusion that the ability to hire and fire

necessarily establishes Sheriff Hannah as the final policymaking

authority for Mingo County conflicts with West Virginia law,

Fourth Circuit precedent, and the above hypothetical from
_Pembaur_.  Like the officials in _Crowley_ and _Greensboro Prof'l
Fire Fighters Ass'n_, sheriffs in West Virginia have the
discretion to hire and fire employees as an initial matter, but
West Virginia vests final policymaking authority for employment
decisions in civil service commissions.  While Sheriff Hannah
possesses authority to suspend or terminate Messer, all of his
decisions are subject to the employment policies implemented and
enforced by the Commission under state law.

West Virginia law requires all appointments,
promotions, reinstatements, removals, discharges, suspensions and
reductions in rank or pay for full-time deputy sheriffs to be in
accordance with W. Va. Code § 7-14-1 _et al_.  Specifically, the
Commission is authorized to "prescribe and enforce rules and
regulations for carrying into effect the provisions of this
article."  W. Va. Code § 7-14-6(1).  Such provisions include the
detailed processes for making and appealing all of the above
employment decisions.  W. Va. Code § 7-14-1 _et al_.  Specifically,
no deputy sheriff "may be removed, discharged, suspended or
reduced in rank or pay except for just cause, which may not be
religious or political, except as provided in section 15 of this
article."  W. Va. Code § 7-14-17(a).  Thus, even though Sheriff

31

Hannah may be able to "hire and fire" deputies in his department, only the Commission is empowered to prescribe rules and regulations for employment decisions under Chapter 7. Accordingly, Sheriff Hannah does not possess final policymaking authority sufficient to impose municipal liability under § 1983 with regard to employment decisions.   This conclusion is consistent both with the Fourth Circuit's decisions in <u>Crowley</u> and <u>Greensboro Prof'l Fire Fighters Ass'n</u> and the plurality's hypothetical in <u>Pembaur</u>.

Furthermore, Messer's categorization overlooks the broad oversight power granted to the Commission which ultimately makes it, rather than Sheriff Hannah, the final authority on the county decisions at issue.  As the plurality in <u>Praprotnik</u> recognized, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with <u>their</u> policies."  485 U.S. at 127 (emphasis in original); <u>see</u> <u>Riddick</u>, 238 F.3d at 523.

The West Virginia Code details the processes for promoting, suspending, reducing rank, and terminating deputy sheriffs.  W. Va. Code §§ 7-14-11, 13, 17.  The civil service commission is charged with prescribing and enforcing these rules

32

as well as investigating any violations. W. Va. Code §§ 7-14-6(1), 6(3). While Sheriff Hannah may have the immediate ability to issue promotions, suspensions, or terminations of deputies, all of these employment decisions are subject to review by the Commission in order to ensure that the sheriff's decisions conform with the Commission's employment policies. The Commission's expansive, statutory investigation and enforcement power establishes it as the final policymaking authority for Mingo County concerning the employment decisions at issue in this case.

Messer argues that Sheriff Hannah's "failure to adhere to the statutory requirements in making promotions" indicates his "control over the employment policies of the Mingo County Sheriff's Department." (Pl.'s Resp. at 6.) State law requires promotions of deputies to "be based on merit and fitness, to be ascertained by competitive examinations" provided by the civil service commission and upon the "superior qualifications" of the candidates. W. Va. Code. § 7-14-13. Messer provides two instances in which Sheriff Hannah failed to follow the statutory promotion requirements: the promotion of Deputy McCloud on February 8, 2006, and the promotion of two deputies in 2009. However, Messer acknowledges that these promotions were

33

temporary.  McCloud's original promotion in 2006 was withdrawn following submission of grievances by Messer and Hatfield, and the promotions of the two deputies in 2009 were set aside by the Commission because of the Sheriff's failure to follow statutory procedure.[13]  Messer's own admission indicates that Sheriff Hannah was subject to review by the Commission, which actually possessed final authority over the promotion decisions.

Messer also argues that Sheriff Hannah had final authority when he suspended him for thirty days for allegedly removing documents from the office, suspended him for ten days and then fired him for insubordination, and effectively fired him through the indefinite suspension for the allegedly fraudulent overtime claim.  Messer nevertheless acknowledges, as he must, that Sheriff Hannah's decisions regarding his suspensions and terminations were all subject to Commission review.  Under West Virginia law, deputies subject to removal, discharge, suspension, or reduction in rank or pay may demand a public hearing before the civil service commission in which the sheriff bears the burden of justifying his or her action.  W. Va. Code § 7-14-17(a).  If the sheriff fails to justify his decision, "then the

---

[13] As noted previously, it is unclear whether the second promotion of Deputy McCloud followed the statutorily required procedure.

deputy shall be reinstated with full pay, forthwith and without any additional order, for the entire period . . ., and no charges may be officially recorded against the deputy's record."  Id.  The Commission reviewed Messer's indefinite suspension for allegedly fraudulent overtime claims, his suspension for insubordination, and his subsequent termination for insubordination.[14]  Of these, the Commission overturned all but the ten day suspension for insubordination.[15]

Additionally, if Messer felt that the assignment to bailiff duty constituted a reduction in rank, then West Virginia law entitles him to a hearing before the civil service commission.  Id.  Messer could have filed a grievance regarding his demotion to bailiff and he could have had it reviewed by the Commission in the same manner as he did regarding his suspensions and terminations.  The statutorily mandated review process by the

---

[14] The only suspension not reviewed by the Commission was the thirty day suspension for allegedly removing documents from the office.  Commission review was unnecessary inasmuch as the suspension was rescinded by Chief Deputy Stroud within two days of its issuance.

[15] Despite the Commission having overturned the indefinite suspension for the alleged falsified overtime, the supreme court of appeals reversed the decisions of the Commission and the circuit court and remanded the case to the circuit court for the entry of an order reinstating the indefinite suspension as originally imposed by Sheriff Hannah.  Messer v. Hannah, 668 S.E.2d 182, 188 (W. Va. 2008).

civil service commission as well as the instances in which the Commission actually reversed Sheriff Hannah's employment decisions further demonstrate Sheriff Hannah's lack of final decision making authority.

In sum, Messer cites Sheriff Hannah's various promotion, suspension, and termination decisions as evidence of his position as final authority of Mingo County employment issues.  Because each of these decisions was subject to review by the Commission, Sheriff Hannah is not considered an official with final decisionmaking authority and, as such, he is not in a position to establish the requisite policy for Mingo County. Being unable to demonstrate a discriminatory or retaliatory policy established by Mingo County, Messer's § 1983 claim fails because there is no basis for municipal liability.[16]

IV.

With respect to the broad assertions of unspecified state claims made by plaintiff, a court has discretion under 28 U.S.C. § 1367(c)(3) to decline the exercise of supplemental

---

[16] Having decided that Messer's federal claims fail as a matter of law, the court need not address the issues of res judicata and whether Messer failed to allege the requisite constitutional violations.

36

jurisdiction if it has previously "dismissed all claims over which it has original jurisdiction." Id.  Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity and considerations of judicial economy. Cf. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7, (1988).

In United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966), which predated the enactment of section 1367, the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  Id.  The Supreme Court further noted that "[c]ertainly if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."  Id. Our court of appeals has read Gibbs as recognizing "the desirability of having state courts interpret questions of state law" and also noted that "the federal interests supporting federal resolution of pendent state claims recede when the federal questions are dismissed."  Mitcheson v. Harris, 955 F.2d 235, 238 (4th Cir.1992); see also Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir.2001) ("under the authority of

28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from state court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met.").

     The only claims upon which federal jurisdiction is based have been dismissed.  Further, the remaining state law claims are not shown to be related to any issues of federal policy.  For these reasons, the court declines to exercise supplemental jurisdiction over the state law claims and remands the state law claims to the Circuit Court of Mingo County.

III.

    The court ORDERS that defendants' motion for summary judgment be, and it hereby is, granted.

     The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: October 15, 2009

John T. Copenhaver, Jr.
United States District Judge

38